### UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| WOBBLEWORKS (HK) LIMITED,<br><br>   Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA, U.S. CUSTOMS & BORDER PROTECTION,<br><br>   Defendants. | **Court No. 25-00985** |

## COMPLAINT

1.    Plaintiff, WOBBLEWORKS (HK) LIMITED ("Plaintiff"), is the importer of merchandise subject to the challenged duties, and acts as the Importer of Record for such imports.

2.    Beginning in February 2025, through a series of executive orders, President Trump invoked the International Emergency Economic Powers Act ("IEEPA") as the asserted legal authority to impose tariffs ("IEEPA duties") on goods imported from nearly every foreign country, including countries from which Plaintiff sources its imports. As a direct and unavoidable consequence of these actions, Plaintiff has been required to pay substantial IEEPA duties on its imported merchandise, resulting in significant and ongoing financial harm.

3.    This Court and the U.S. Court of Appeals for the Federal Circuit have already held that IEEPA does not authorize the imposition of these tariffs. *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025) ("*V.O.S. Selections*"). In *V.O.S. Selections*, the Federal Circuit squarely rejected the government's reliance on IEEPA as a source of tariff authority, concluding that the statute does not permit the President to impose broad, revenue-raising duties on imported goods.

1

4.    The Supreme Court heard oral argument in *V.O.S. Selections* and a companion case originating from the U.S. District Court for the District of Columbia[1] on November 5, 2025, and a decision is anticipated in the coming months.

5.    Through this action, Plaintiff asks the Court to hold that the IEEPA duties imposed by Defendants, and the Executive Orders authorizing those duties, are unlawful and exceed the President's statutory authority under IEEPA.

6.    This separate action is necessary because, even if the IEEPA duties and underlying Executive Orders are held unlawful by the Supreme Court, it is uncertain whether Defendants will issue refunds to importers that have paid IEEPA duties, including Plaintiff, in the absence of their own judgment and judicial relief.

7.    This action is further necessary now because this Court has stated in a recent opinion that "Customs has no authority to make any decision regarding the legality or constitutionality" of the IEEPA duties, and that while the Executive Orders that purport to authorize the IEEPA duties remain extant "there is no Customs decision of a type that can be made or protested." *See AGS Company Automotive Solutions v. U.S. Customs and Border Protection*, Slip Op. 25-154 at 7, 2025 WL 3634261 (Ct. Int'l Tr. December 15, 2025) ("*AGS*").

8.    The entries for which Plaintiff paid tariffs imposed under authority of IEEPA have already begun to liquidate.  This Court ruled in *AGS* that "[b]ecause Customs has no authority to make any decision regarding the legality or constitutionality of the Executive Orders at issue…liquidation of the entries at issue is not final under § 1514," and that where jurisdiction pursuant to 28 U.S.C. § 1581(i) has attached, "this court has authority to order reliquidation."  *Id.*

---

[1] *Learning Resources, Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025), *cert granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025).

9.     Accordingly, Plaintiff seeks (i) a declaration that the IEEPA duties imposed pursuant to the challenged Executive Orders are unlawful; and (ii) a full refund from Defendants of all IEEPA duties paid by Plaintiff to the United States as a result of those Executive Orders, regardless of the liquidation status of the affected entries, as well as the recovery of any additional IEEPA duties Plaintiff continues to pay during the pendency of this action.

## PARTIES

10.     Plaintiff is a U.S. importer of record that imported merchandise into the United States and was required to pay IEEPA duties on its entries of merchandise.

11.     Defendant United States of America is the recipient of the disputed IEEPA duties and is a proper defendant in this action pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1581(i)(1)(B).

12.     Defendant United States Customs and Border Protection ("CBP") is the agency of the United States charged with administering and enforcing customs laws, including the assessment and collection of duties on imported merchandise, and CBP collected the IEEPA duties paid by Plaintiff on its entries

13.     The United States of America and CBP are referred to collectively in this Complaint as "Defendants."

## JURISDICTION

14.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(i). *See V.O.S. Selections*, 149 F.4th at 1334.

15.     This Court possesses all the powers in law and equity of a United States district court. *See* 28 U.S.C. § 1585. In an action brought under 28 U.S.C. § 1581, including under § 1581(i), the Court is authorized to enter judgment against the United States for monetary relief and to grant all appropriate civil relief, including declaratory judgments, injunctions, orders of remand,

and writs of mandamus or prohibition, including orders directing the refund and reliquidation of unlawfully collected duties, notwithstanding the liquidation status of the affected entries. *See* 28 U.S.C. §§ 2643(a)(1), (c)(1); *V.O.S. Selections*.

## STANDARD OF REVIEW

16.    Pursuant to 28 U.S.C. § 2640(e), actions commenced under 28 U.S.C. § 1581(i) are reviewed in accordance with the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706. Under those standards, the Court is required to hold unlawful and set aside agency action, findings, and conclusions that are contrary to constitutional right, power, privilege, or immunity, or that exceed statutory jurisdiction, authority, or limitations. See 5 U.S.C. § 706(2)(B), (C); 28 U.S.C. § 2640(e).

## STANDING

17.    Pursuant to 28 U.S.C. § 2631(i), any civil action within the jurisdiction of this Court may be commenced by any person who is adversely affected or aggrieved by agency action within the meaning of 5 U.S.C. § 702.

18.    Plaintiff has standing to bring this action because, as the importer of record for entries subject to the challenged IEEPA duties, Plaintiff is directly and adversely affected and aggrieved by Defendants' actions requiring Plaintiff to pay IEEPA duties imposed pursuant to the challenged Executive Orders.

## TIMELINESS

19.    Pursuant to 28 U.S.C. § 2636(i), an action commenced under the Court's residual jurisdiction in 28 U.S.C. § 1581(i) must be filed within two years after the cause of action first accrues.

20.    Plaintiff's claims accrued, at the earliest, on February 1, 2025, when Defendants

first issued Executive Order 14195, which directed the imposition and collection of the IEEPA

duties challenged in this action. See *Executive Order 14195 of February 1, 2025: Imposing Duties

to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg.

9121 (February 7, 2025) ("Executive Order 14195").

21.     Because this action was filed within two years of the accrual of Plaintiff's claims,

it is timely under 28 U.S.C. § 2636(i).

## GENERAL PLEADINGS

## I.     The President Issued a Series of Tariffs Under the Purported Authority of IEEPA

### A.     "Fentanyl" IEEPA Tariffs

22.     On February 1, 2025, President Trump issued three Executive Orders imposing tariffs

on imports from Canada, Mexico, and China. Each Executive Order purported to rely on IEEPA as

authority to impose tariffs, asserting the existence of national emergency as justification (collectively,

"Trafficking Tariff Orders").

23.     The executive order directed at Mexico, Executive Order 14194, 90 Fed. Reg. 9,117,

*Imposing Duties To Address the Situation at Our Southern Border* ("Mexico Tariff Order"),[2] imposed

an additional 25% tariff on the import of goods from Mexico. The President's claim of emergency

powers was based on "the grave threat to the United States posed by the influx of illegal aliens and

illicit drugs into the United States" and "the failure of Mexico to arrest, seize, detain, or otherwise

intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and

illicit drugs." *Id.*

24.     The executive order directed at Canada, Executive Order 14193, 90 Fed. Reg. 9,113,

*Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border* ("Canada Tariff

---

[2] Exec. Order No. 14194, *Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg.
9,117 (Feb. 7, 2025)

Order"),[3] declared an emergency because of opioid trafficking, and imposed a 25% tariff, with certain exceptions.

25.     The executive order directed at China, Executive Order 14195, 90 Fed. Reg. 9,121, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China* ("China Tariff Order"),[4] imposed and additional 10% *ad valorem* duties on virtually all goods originating in China.  Executive Order 14195 also declared an emergency because of opioid trafficking, declaring that the "the sustained influx of synthetic opioids" was a national emergency and that "[m]any PRC-based chemical companies also go to great lengths to evade law enforcement and hide illicit substances in the flow of legitimate commerce." The President's claim of emergency powers was based on "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of the [People's Republic of China] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [ transnational criminal organizations], criminals at large, and drugs." *Id.*

26.     On February 5, 2025, the President issued yet another order, Executive Order 14200, 90 Fed. Reg. 11,463, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, which amended the China Tariff Order.[5]

27.     On March 3, 2025, the President amended the China Tariff Order issued Executive Order 14228, which again amended the China Tariff Order by increasing the IEEPA duties on

---

[3] Exec. Order No. 14193, *Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 7, 2025).

[4] Exec. Order No. 14195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 7, 2025).

[5] Exec. Order No. 14200, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (March 7, 2025).

imports from China to 20%,[6] claiming that "the PRC has not taken adequate steps to alleviate the illicit drug crisis" as justification. *Id.*

**B.** **"Reciprocal" IEEPA Tariffs**

28.     On April 2, 2025, citing trade deficits with the United States' trading partners as its own national emergency, President Trump issued Executive Order 14257, 90 Fed. Reg. 15,041, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China* ("Reciprocal Tariff Order"),[7] which imposed a 10% baseline "reciprocal" tariff on nearly all imports to the United States, effective April 5, and additional "reciprocal" tariffs on 57 countries, effective April 9, 2025. *Id.* at 15049-50 (Annex I). These higher country-specific tariffs ranged from 11% to 50%. *Id.*

29.     The Reciprocal Tariff Order asserts that "U.S. trading partners' economic policies ... suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits." *Id.* at 15041.

30.     On April 8, 2025, the President responded to retaliatory tariffs from China by raising the reciprocal tariff rate on products of China by 50 percentage points – from 34% to 84% – in Executive Order 14259, 90 Fed. Reg. 15,509, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China.*[8]

---

[6] Exec. Order No. 14228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11463 (March 7, 2025).

[7] Exec. Order No. 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15041 (April 7, 2025).

[8] Exec. Order No. 14259, *Amendment to Reciprocal Tariffs and Updated Duties As Applied to Low-Value Imports from the People's Republic of China,* 90 Fed. Reg. 15509 (Apr. 14, 2025).

31.     On April 9, 2025, the President issued Executive Order 14266, 90 Fed. Reg. 15,625, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*,[9] suspending for ninety days the higher country-specific "reciprocal" tariffs on all countries except China, for which "reciprocal tariff" was increased again from 84% to 125%. The 20% trafficking tariff previously imposed on imports from China remained in effect, such that most imports from China were subject to a minimum IEEPA tariff rate of 145%.

32.     In implementing the Executive Orders' tariff regime, the Defendants directed changes to the Harmonized Tariff Schedule of the United States ("HTSUS"), requiring the goods subject to the IEEPA duties to be entered under new tariff codes.

33.     On April 14, 2025, several importers filed an action in this Court challenging the legality of the IEEPA duties. *See V.O.S. Selections, et al. v. Donald J. Trump, et al.*, No. 25-cv-00066 (Ct. Int'l Trade, ECF No. 2). In that action, this Court held that the IEEPA tariffs imposed by Executive Orders were unlawful, and the Federal Circuit, sitting *en banc*, affirmed that ruling, rejecting the government's assertion that IEEPA authorizes the imposition of such tariffs.

34.     In the months since the *V.O.S. Selections* complaint was filed, the President, invoking IEEPA, has issued additional executive orders imposing additional tariffs and modifying others.[10] As explained below, IEEPA does not authorize the President to impose tariffs. By this

---

[9] Exec. Order No. 14266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625 (Apr. 9, 2025).

[10] *See, e.g., Executive Order 14298: Modifying Reciprocal Tariff Rates to Reflect Discussions With the People's Republic of China*, 90 Fed. Reg. 21831 (May 21, 2025); *Executive Order 14316: Extending the Modification of the Reciprocal Tariff Rates*, 90 Fed. Reg. 30823 (July 10, 2025); *Executive Order 14326: Further Modifying the Reciprocal Tariff Rates*, 90 Fed. Reg. 37963 (Aug. 6, 2025); *Executive Order 14334: Further Modifying Reciprocal Tariff Rates To Reflect Ongoing Discussions With the People's Republic of China*, 90 Fed. Reg. 39305 (Aug. 14, 2025); *Executive Order 14346: Modifying the Scope of Reciprocal Tariffs and Establishing Procedures for Implementing Trade and Security Agreements*, 90 Fed. Reg. 43737 (Sept. 10, 2025); *Executive Order 14358: Modifying Reciprocal Tariff Rates Consistent With the Economic and Trade Arrangement Between the United States and the People's Republic of China*, 90 Fed. Reg. 50729

complaint, Plaintiff challenges only the orders this Court and Federal Circuit have already found to be unlawful ("Challenged Tariff Orders").

**C. CBP's Implementation of the Unlawful IEEPA Duties**

35.     CBP is charged with the assessment and collection of duties, including the IEEPA duties. *See* 19 U.S.C. §§ 1500, 1502.

36.     CBP is responsible for assessing and collecting any tariffs, including the IEEPA duties, on due upon entry of imported goods.  Tariff rates are determined principally by the classification of the goods under the HTSUS, which sets out the tariff rates and statistical categories using a series of nested chapters, headings, and subheadings. 19 U.S.C. § 1202.

37.     The United States International Trade Commission ("USITC") publishes and maintains the HTSUS consistent with presidential orders. *See* 19 U.S.C. §§ 1202, 3005, 3006; *see also Michael Simon Design, Inc. v. United States*, 33 C.I.T. 1003, 1010 (2009) ("The authority to modify the HTSUS lies with the President"); *Maple Leaf Marketing, Inc. v. United States*, 582 F. Supp. 3d 1365, 1378–79 (Ct. Int'l Trade 2021).

38.     Chapter 99 of the HTSUS provides for special classification provisions and requirements that apply in addition to the tariff rates provided for in Chapters 1-97 of the HTSUS. *See* 19 U.S.C. § 1202.  Subchapter III to Chapter 99, HTSUS, provides for "Temporary Modifications Established Pursuant to Trade Legislation.  *Id*.

39.     In implementing the trafficking IEEPA tariffs and the reciprocal IEEPA tariffs, Defendants directed changes to the HTSUS, requiring that goods subject to the IEEPA tariffs to

---

(Nov. 7, 2025); *Executive Order 14360: Modifying the Scope of the Reciprocal Tariffs With Respect to Certain Agricultural Products*, 90 Fed. Reg. 54091 (Nov. 25, 2025).

be entered under new tariff codes within Subchapter III to Chapter 99, HTSUS, in addition to all other applicable HTSUS subheadings.[11]

40.    CBP communicates to the trade community changes to the HTSUS and its administration of those changes through its Cargo Systems Messaging Service ("CSMS"). Through CSMS guidance,[12] CBP has directed and effectuated the assessment and collection of the unlawful IEEPA duties challenged in this action. which is a final agency action subject to review under the APA. Each such CSMS guidance constitutes final agency action subject to review under the APA because it represents the consummation of CBP's decision-making process and announces CBP's definitive implementation of the IEEPA duties.

### D. Liquidation

41.    "'Liquidation' means the final computation or ascertainment of duties on entries for consumption or drawback entries." 19 C.F.R. § 159.1.

42.    When merchandise is entered (imported) into the United States, the importer of record is required to file an entry declaration asserting the value, country of origin, and HTSUS classification of the imported goods, and to deposit estimated duties based on that declaration. *See* 19 U.S.C. § 1484.

---

[11] *See, e.g.*, *Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9431 (February 12, 2025); *Further Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1 2025 Executive Order Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11426 (March 6, 2025); Executive Order 14257 at Annex III, 90 Fed. Reg at 15088-15109.

[12] *See, e.g.,* CSMS # 64299816, Update – Additional Duties on Imports from China and Hong Kong (Mar. 3, 2025), available at https://content.govdelivery.com/accounts/USDHSCBP/bulletins/3d52328; U.S. Customs & Border Prot., CSMS # 64680374, Guidance – Reciprocal Tariffs, April 5 and April 9, 2025, Effective Dates (Apr. 8, 2025), available at https://content.govdelivery.com/accounts/USDHSCBP/bulletins/3daf1b6.

43.    Unless liquidation of an entry is extended or suspended by CBP, liquidation – *i.e.*, the final and conclusive determination of the duties owed on the entry – must occur within one year from the date of entry. See 19 U.S.C. § 1504.

44.    Prior to liquidation, CBP has discretion to examine or review an entry to verify the final value, classification, duty rate, and amount of duties owed. In the ordinary course, however, and particularly for high volumes of routine entries, liquidation occurs automatically through CBP's systems without individualized inspection or substantive review.

45.    For "formal" entries with an entered value over $2,500, automatic liquidation typically occurs at least 314 days and not more than 1 year after the date of entry of the goods. Notice of liquidation for formal entries is posted on CBP's website at https://trade.cbp.dhs.gov/ace/liquidation/LBNotice/.

46.    For "informal" entries with an entered value of $2,500 or less, automatic liquidation typically occurs within one month after entry.

47.    "Decisions" of CBP enumerated in 19 U.S.C. § 1514(a), as well as clerical errors, mistakes of fact, or other inadvertence, become final 180 days after liquidation unless an administrative protest is filed.  *See* 19 U.S.C. § 1514(a).

48.    This Court has recently held that the imposition of tariffs purportedly authorized under IEEPA does not constitute a protestable "customs decision" within the meaning of 19 U.S.C. § 1514 so long as the Executive Orders imposing the IEEPA duties remain in effect. As a result, liquidation of entries subject to such duties does not give rise to § 1514 finality, and importers are deprived of the ability to challenge the duties through the administrative protest process. *See AGS*, Slip Op. 25-154 at 7.

49.     In *AGS*, this Court expressly took note of the Government's representations made in that case and in related litigation in that case and related cases that "it will not object to the court ordering reliquidation of plaintiffs' entries subject to the challenged IEEPA duties if such duties are found to be unlawful." *AGS,* Slip Op. 25-154 at 3. This Court held that principles of judicial estoppel would preclude the Government from later adopting a contrary position. *Id.* at 5. The Court further reaffirmed, consistent with its unanimous decision in *In Re Section 301 Cases*, that it possesses "the explicit power to order reliquidation and refunds where the government has unlawfully exacted duties." *Id.* at 6 (citing *In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1363 (Ct. Int'l Tr. 2021)).  On that basis, the Court concluded that, once jurisdiction under 28 U.S.C. § 1581(i) has attached, the Court retains authority to order the reliquidation of entries and refund of IEEPA duties – even after liquidation – if the IEEPA duties are ultimately determined to be unlawful by the Supreme Court.

## II.     The Challenged Tariffs Exceed the President's Authority Under IEEPA

50.     The Challenged Tariff Orders purport to invoke as authority IEEPA, 50 U.S.C. § 1701 *et seq.*, the National Emergencies Act, 50 U.S.C. § 1601 *et seq.*, section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483, and 3 U.S.C. § 301, to impose tariffs on imported merchandise.

51.     None of these statutes authorizes the President to impose tariffs. Of the cited statutes, Defendants rely exclusively on IEEPA to assess and collect the IEEPA duties challenged in this action.  IEEPA, however, does not authorize the imposition of tariffs, and therefore provides no lawful basis for the Challenged Tariff Orders or the duties imposed pursuant to them.

52.     IEEPA grants the President certain powers, but they "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been

declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

53.    Those powers include the ability to "investigate, regulate, or prohibit" certain transactions in foreign exchange, payments through banks involving foreign countries or nationals, or imports of "currency or securities." 50 U.S.C. § 1702 (a)(1)(A).

54.    The President may also control, block, or prohibit the movement or importation of funds or property in which "any foreign country" or foreign national has "interest" in, and which is also subject to the U.S. jurisdiction. 50 U.S.C. § 1702(a)(1)(B).

55.    Finally, and only when the U.S. is engaged in "armed hostilities" or has been attacked by a foreign country, the President may "confiscate" property of such a foreign person or country that also is subject to U.S. jurisdiction. 50 U.S.C. § 1702(a)(1)(C).

56.    The text of IEEPA does not use the word "tariff" or any term of equivalent meaning.

57.    IEEPA was first enacted in 1977 and has been amended several times, but it has never been amended to authorize, or used by any other President to impose, tariffs.

## A. The U.S. Constitution Vests the Power to Impose Tariffs in Congress, Not the President

58.    The United States Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art. I, § 1.

59.    The United States Constitution also provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises..." U.S. CONST. art. I, § 8, cl. 3 ("Taxing Clause"), and "[t]o regulate Commerce with foreign Nations." Id., cl. 3 ("Commerce Clause").

60.    It has always been understood that tariffs fall within the Taxing and Commerce Clauses.

61.    Even assuming that the U.S. Constitution permits Congress to delegate to the President any portion of its enumerated powers, such delegation must, at a minimum, be accompanied by an intelligible principle that meaningfully directs and constraints the exercise of delegated authority. *See Fed. Commc'ns Comm'n v. Consumers' Research*, 145 S. Ct. 2482, 222 L. Ed. 2d 800 (2025). Congress provided no such intelligible principle in IEEPA with respect to the imposition of tariffs.

62.    Interpreting IEEPA to authorize the unilateral imposition of tariffs would therefore render the statute constitutionally infirm, as it would amount to an unchecked delegation of Congress's exclusive power to regulate tariffs in violation of the nondelegation doctrine. To avoid that constitutional defect, IEEPA cannot be read to authorize the imposition of tariffs.

63.    Moreover, courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (quoting *Utility Air Regulatory Group v. EPA*, 573 U. S. 302, 324 (2014)). Where Congress has not clearly spoken, courts are directed to find such matters are beyond the President's authority. *Biden v. Nebraska*, 600 U.S. 477, 505-06 (2023).

64.    By any objective measure, the Challenged Tariff Orders implicate maters of "vast economic and political significance" imposing sweeping and unprecedented tariffs on imports from nearly every foreign country. Because IEEPA does not clearly authorize the President to impose tariffs – indeed, the statute does not mention the words "tariff" or "duty" and is not even housed in the same title of the U.S. Code as Congress's actual trade laws (Title 19) – the Challenged Tariff Orders exceed the President's authority and cannot lawfully be implemented or enforced by Defendants.

**B. Courts, including this Court, Have Rejected IEEPA as a Source of Tariff Authority.**

65.     On May 28, 2025, a three-judge panel of this Court granted summary judgment to the plaintiffs in *V.O.S. Selections* and permanently enjoined the government from enforcing the IEEPA duties at issue in that case. That decision was appealed to the Court of Appeals for the Federal Circuit.

66.     The Federal Circuit stayed this Court's decision and injunction and ordered an expedited briefing schedule and hearing.

67.     Sitting *en banc*, the Federal Circuit issued its decision on August 29, 2025, affirming this Court's decision that the IEEPA duties are unlawful. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

68.     In a separate lawsuit filed by a separate group of importers, the U.S. District Court for the District of Columbia held that IEEPA does not authorize tariffs of any sort. *See Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025), *cert. granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025). That decision was appealed to the Court of Appeals for the D.C. Circuit, but before the D.C. Circuit held argument, the United States Supreme Court granted certiorari in both *V.O.S. Selections* and *Learning Resources*. The cases were consolidated, with argument on November 5, 2025.

**III.    Plaintiff paid preliminary IEEPA duties**

69.     As of the filing of this Complaint, Plaintiff has paid IEEPA duties imposed by the Challenged Tariff Orders under newly created IEEPA tariff provisions.

70.     Plaintiff has been required to pay these IEEPA duties on a continuous and ongoing basis in connection with its importations.

71.     Entries on which Plaintiff has paid IEEPA duties pursuant to the Challenged Tariff Orders have already begun to liquidate, placing Plaintiff at imminent risk of losing the ability to recover unlawfully collected duties absent judicial relief.

## STATEMENT OF CLAIMS

## COUNT I

## THE CHALLENGED TARIFF ORDERS ARE *ULTRA VIRES* UNDER *V.O.S. SELECTIONS*

72.     Plaintiff incorporates paragraphs 1-71 above by reference.

73.     The Court of International Trade in *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d. 1350, 1383 (Ct. Int'l Trade 2025), *aff'd*, 149 F.4th 1312 (Fed. Cir. 2025), held that the President exceeded his authority under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, when he imposed tariffs on imported goods.

74.     As the *V.O.S. Selections* court explained, IEEPA authorizes the President only to "investigate, regulate, or prohibit" certain foreign transactions in times of national emergency; it does not authorize the imposition of tariffs or duties on imports, and neither the text of IEEPA nor its legislative history contains any clear delegation to the President to set tariff rates.

75.     The Federal Circuit affirmed that interpretation, holding that Congress did not clearly delegate to the President the authority to impose tariffs under IEEPA and that reading IEEPA to permit such authority would raise grave constitutional concerns, including under the major questions and non-delegation doctrines.

76.     The Challenged Tariff Orders include Executive Orders 14195, 14257, and 14266, which were expressly ruled to be unlawful in *V.O.S. Selections*.  Other Challenged Tariff Orders at issue in this case modified Executive Orders 14195 and 14257, and are materially identical in structure, authority claimed, and effect to those struck down in *V.O.S. Selections*. They purport to

impose duties and modify the HTSUS solely under IEEPA. For the same reasons set forth in *V.O.S. Selections* and its affirmance by the Federal Circuit, the Challenged Tariff Orders exceed the President's statutory authority and are therefore unlawful, *void ab initio*, and without effect as applied to Plaintiff.

77.      Plaintiff respectfully requests that this Court apply its precedent and the binding decision of the Federal Circuit, declare the Challenged Tariff Orders unlawful as to Plaintiff, enjoin Defendants from enforcing them as to Plaintiff, and order refund of all IEEPA duties collected from Plaintiff, with interest as provided by law.

**COUNT II**

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706 (IN EXCESS OF STATUTORY AUTHORITY)**

78.      Paragraphs 1 through 77 are incorporated by reference.

79.      CBP is an agency within the meaning of the APA. *See* 5 U.S.C. § 701. The APA provides that that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." *Id.* The APA authorizes judicial review of "final" agency actions. *See* 5 U.S.C. § 704. Courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2).

80.      Defendants' agency actions implementing the Challenged Tariff Orders by modifying the HTSUS or otherwise implementing the Challenged Tariff Orders and collecting duties are "final" agency actions because they finally "determine" the "rights or obligations" of parties and are backed by "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

81.     These actions implementing the Challenged Tariff Orders are "in excess of statutory jurisdiction, authority, [and] limitations" because Defendants lack statutory authority to implement, collect, or otherwise demand the payment of tariffs that have not been enacted into law by Congress, have not been duly promulgated pursuant to a lawful delegation from Congress, or have not been authorized by a lawful executive order or proclamation pursuant to a lawful delegation of Congress.

82.     The agency actions modifying the HTSUS explicitly state that they are implementing the Challenged Tariff Orders and cite no other authority for these modifications.

83.     Accordingly, these actions fall within Defendants' statutory jurisdiction and authority only to the extent that the Challenged Tariff Orders are themselves lawful. But as discussed above and alleged in Count I, the Challenged Tariff Orders are *ultra vires* and unlawful because they exceed the President's authority under IEEPA. And, as alleged in Count III, to the extent IEEPA does authorize these tariffs, IEEPA is itself an unlawful delegation of legislative authority. The agency actions modifying the HTSUS or otherwise implementing the Challenged Tariff Orders are, thus, themselves unlawful.

84.     Defendants' agency actions are also "contrary to constitutional right, power, privilege or immunity," 5 U.S.C. § 706(2)(B), because, as set forth in Count IV and incorporated by reference herein, their only purported source of authorization, IEEPA, violates Article I, § 1 of the U.S. Constitution.

85.     For these reasons, this Court should declare that Defendants' agency actions are "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), and "contrary to constitutional right, power, privilege, or immunity," § 706(2)(B), set modifications to the HTSUS

aside, and enjoin Defendants and their agents, employees, and all persons acting under their direction or control from taking any action to collect IEEPA duties.

86.     If Defendants' agency actions are not declared unlawful, set aside and enjoined, Plaintiff will suffer substantial injury, including irreparable injury.

## COUNT III

## IN THE ALTERANTIVE – THE CHALLENGED TARIFF ORDERS ARE UNCONSTITUTIONAL

87.     Plaintiff incorporates paragraphs 1-86 above by reference.

88.     In the alternative, if the Court were to construe IEEPA as authorizing tariffs, the IEEPA tariff orders must nevertheless be held unlawful because IEEPA in that event would constitute an impermissible delegation of legislative power from Congress to the President.

89.     Article I, § 1 and § 8 of the U.S. Constitution vests in Congress exclusively the power to "lay and collect ... Duties". U.S. CONST. art. I, § 8, cl. 1.

90.     Under separation-of-powers principles and binding precedent of the U.S. Supreme Court, Congress cannot delegate its power to the President unless, at the very least, it provides an intelligible principle that directs and meaningfully constrains the President's exercise of that power. IEEPA does not do that.

91.     Plaintiff therefore seeks a declaration that the IEEPA tariff orders are unconstitutional as applied to Plaintiff, an order enjoining Defendants from enforcing those orders against Plaintiff, and an order requiring Defendants to refund all IEEPA duties collected from Plaintiff, together with interest as provided by law.

## COUNT IV

## (DECLARATORY RELIEF, 28 U.S.C. § 2201)

92.     Plaintiff incorporates paragraphs 1-91 above by reference.

93.    Federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

94.    Plaintiff's claims present an actual controversy as to the President's authority under IEEPA, the constitutionality of IEEPA, and the authority of CBP to implement and collect the resulting tariffs.

95.    Plaintiff is an importer of record and has suffered injury by having been required to pay IEEPA duties as a result of the Challenged Tariff Orders on goods it has imported into the United States.

96.    This Court can exercise its equitable power to enter a declaratory judgment that the Challenged Tariff Orders are unlawful for any of the above reasons, and that CBP lacks authority to implement and collect the resulting tariffs, as to Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

    a.    declare that the President lacks authority under IEEPA to set tariffs;

    b.    declare that the Challenged Tariff Orders are *ultra vires* and *void ab initio* with respect to Plaintiff;

    c.    declare that, with respect to Plaintiff, CBP lacks authority to implement and collect any tariffs set out in the HTSUS that are based on the Challenged Tariff Orders;

    d.    with respect to Plaintiff, enjoin Defendants from imposing and enforcing any tariffs set out in the HTSUS that are based on the Challenged Tariff Orders;

    e.    order the United States to refund to Plaintiff the IEEPA duties collected on entries for which Plaintiff is the importer of record, including entries that are finally liquidated, with interest as provided by law;

f.   award Plaintiff its reasonable costs, including attorneys' fees, incurred in bringing

this action; and

g.   grant such further relief as this Court deems proper.

Respectfully submitted,

*/s/ Alena A. Eckhardt*
Alena A. Eckhardt
NAKACHI ECKHARDT & JACOBSON, P.C.
50 California Street, Suite 1500
San Francisco, CA 94111
(415) 498-0070
eckhardt@TradeLawCounsel.com

*Counsel for Plaintiff WobbleWorks (HK) Limited*

Dated: December 28, 2025